# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 22-1672V

| | |
|---|---|
| KATHLEEN COLLINS, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: October 6, 2025 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*John Robert Howie*, Howie Law, PC, Dallas, TX, for Petitioner.

*Madelyn Weeks*, U.S. Department of Justice, Washington, DC, for Respondent.

### **RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES**[1]

On November 10, 2022, Kathleen Collins filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of influenza ("flu") and pneumococcal vaccines received on October 14, 2021. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

The parties were unable to settle the claim, and have now fully briefed entitlement and damages (ECF Nos. 34, 35, 36). For the reasons set forth herein, I find that Petitioner is entitled to compensation, and award damages for actual pain and suffering in the amount of $55,000.00, plus $61.97 for unreimbursed, out-of-pocket medical expenses.

## I.  Factual Evidence

### A. Medical Records

On October 14, 2021, Petitioner received flu and pneumococcal vaccines in her left deltoid at a pharmacy. Ex. 2 at 2. Three and a half months later, on January 28, 2022, she contacted her primary care provider's ("PCP") office requesting an appointment for "shoulder pain since receiving flu vaccine on October 14, 2021." Ex. 6 at 1. A telehealth appointment was scheduled for February 1, 2022, but it appears that Petitioner did not attend this appointment. *Id.*; Ex. 3 at 690.

On February 22, 2022 (now over four months after vaccination), Petitioner was seen by nurse practitioner ("NP") Tabitha Putrus. Ex. 3 at 707. She reported "left shoulder pain since she had her influenza vaccine (October 2021)." *Id.* at 708. Petitioner explained that her "pain started about 3 hours after vaccine." *Id.* The pain was in the muscle and top of the shoulder, and was worsening over time. *Id.* On examination, her passive range of motion ("ROM") was intact, but her active ROM was "painful in all fields." *Id.* at 709. NP Putrus diagnosed Petitioner with tendinitis of left rotator cuff. *Id.* NP Putrus noted Petitioner's condition as "[l]ess likely caused by vaccine since pain is not of deltoid, but the shoulder itself" and thought there was "[l]ikely rotator cuff involvement." *Id.* She recommended physical therapy ("PT") and non-steroidal anti-inflammatory drugs for pain. *Id.*

On March 10, 2022, Petitioner returned to her PCP's office for evaluation of continuing shoulder pain. Ex. 3 at 721. Petitioner saw Dr. Ayano Kiyota, who noted Petitioner "has a pinpoint pain at the left lateral upper arm." *Id.* at 722. She described a "constant ache," and worsening pain with internal rotation and reaching backward or overhead. *Id.* She had tried Tylenol, with no relief. *Id.* Physical examination of her left shoulder showed "tenderness at the upper part of deltoid muscle" and "[m]oderately decreased ROM." *Id.* at 725. Dr. Kiyota assessed Petitioner with pain of left deltoid, stating that she had developed "localized and severe pain in deltoid muscle soon after" vaccination, and she suspected "possible intramuscular hematoma in the deltoid." *Id.* at 726. Dr. Kiyota recommended PT, an ultrasound, and topical gel. *Id.* at 726.

Petitioner underwent an ultrasound of her left shoulder on March 30, 2022. Ex. 3 at 747. The ultrasound showed tiny intrasubstance tearing of the supraspinatus tendon, but "[n]o measurable tendon defect. No evidence of full-thickness rotator cuff tear," mild subacromial subdeltoid bursal thickening, mild biceps tendinosis, and a small posterior

glenoid joint effusion. *Id.* at 748-49. Petitioner's PCP sent Petitioner a message explaining that there were "multiple tiny abnormalities or tears in the tendons in [her] upper arm," and that PT would help. *Id*. at 766.

Petitioner attended a PT evaluation on April 4, 2022. Ex. 3 at 773. The record of the evaluation lists an injury date of "October 2021," explaining that Petitioner reported "left shoulder pain after receiving the influenza vaccination back in october." *Id*. Petitioner stated that her pain started "about 3 hours after receiving the shot" and had persisted since then. *Id*. Petitioner described the pain as "annoying at rest" and "sharp during movement," and she had difficulty sleeping on her left side and raising her arm overhead or behind her. *Id.* Tylenol, ice and heat had not provided relief. *Id*. She rated her pain six out of ten. *Id*. at 784.

The physical therapist found that Petitioner's left shoulder passive ROM was 148 degrees in flexion (compared to 166 on the right side), 96 degrees in abduction (compared to 168 on the right side), five degrees in internal rotation (vs 76 on the right side) and 52 degrees in external rotation (vs 98 on the right side), all with pain. Ex. 3 at 774. Petitioner had "pain through full limited ROM in all directions especially in abduction," as well as weakness due to pain in all directions. *Id*. at 776.

On April 6, 2022, Petitioner had a follow up appointment with her PCP for her left shoulder pain. Ex. 3 at 791. Petitioner now complained of a burning pain her neck. *Id.* at 791. She was given a prescription for a muscle relaxer and advised to use heat, ice, and light stretching. *Id*. at 792.

Petitioner continued with PT, and after a month of sessions, her left shoulder ROM had improved somewhat (with passive ROM in internal rotation now 56 degrees, compared to five degrees at the start of PT). Ex. 3 at 868. Her ROM in other planes was the same or slightly improved. *Id*. Her pain level was now five out of ten. *Id*. at 876.

Petitioner saw her PCP again on May 23, 2022. Ex. 3 at 883. She had seen slight improvement in her ROM from PT. *Id*. On examination, her left shoulder passive ROM was 100 degrees in abduction, ten degrees in internal rotation, and 80 degrees in external rotation. *Id*. at 885. She was assessed with adhesive capsulitis and tendinopathy of the left rotator cuff, and advised that continuing PT could be helpful, but that she should not push past pain. *Id*. A steroid injection was offered, but Petitioner deferred. *Id*.

On June 27, 2022, Petitioner returned to her PCP for left shoulder adhesive capsulitis. Ex. 8 at 26. She had some improvement in ROM, but her pain was about the same and "pain with daily activities remains an issue." *Id*. at 26, 29. On examination, her left shoulder passive ROM was 90 degrees in abduction and 45 degrees in internal rotation. *Id*. at 28. Petitioner received a cortisone injection for pain management and was advised to continue PT. *Id*. at 29.

3

At her twelfth PT session on July 6, 2022 (the last time her ROM was measured), Petitioner stated that she felt her mobility was improving, but her left shoulder passive ROM was *worse* than it had been when she started PT in all planes except for internal rotation. Ex. 8 at 54. Her passive ROM was now 118 degrees in flexion, 85 degrees in abduction, 48 degrees in internal rotation, and 45 degrees in external rotation. *Id*. She rated her pain level as six out of ten. *Id*. at 63.

Petitioner continued PT for three weeks longer, attending a total of 19 sessions between April 4 and July 27, 2022. Ex. 8 at 126. During PT, her pain levels ranged from five to seven out of ten. Ex. 3 at 784, 932; Ex. 8 at 63. At the final session on July 27th, she reported "feeling much better." Ex. 8 at 126. The therapist noted that Petitioner was being discharged from PT because she was leaving for another state to help her husband work on their second home. *Id*. The therapist did not measure Petitioner's ROM at this visit "due to increased pain and muscle guarding" but noted that he was "[n]ot seeing improvement since last date of measurement 7/6/22." *Id*.

### B. Testimonial and Other Evidence

Petitioner filed three sworn statements in support of her claim. Exs. 1, 9, 10. Petitioner states that about three hours after vaccination she "began to experience a dull aching pain in [her] left upper arm." Ex. 1 at ¶ 4. She assumed that the pain was "routine, albeit worse than normal." *Id*.

In the weeks after vaccination, the holidays were approaching and COVID-19 cases were surging. Ex. 9 at ¶ 3. Petitioner made several attempts to contact her PCP during this timeframe without luck; she was put in a queue with a recording, and could never reach a live person. *Id*. She was also very afraid of becoming ill with COVID-19 because both her husband and adult daughter have comorbidities that make COVID particularly dangerous. *Id*. at ¶ 4. Additionally, she was grieving the loss of another adult daughter, who died just five months prior to vaccination. *Id*. at ¶ 5.

After living with the pain for 11 weeks, Petitioner decided that she needed a professional evaluation, and contacted her PCP. Ex. 1 at ¶ 5. She did not attend the scheduled telehealth visit, deciding to wait for an in-person appointment. *Id*.

As of November 2022 (when she signed her first sworn statement), Petitioner remained unable to sleep on her left side due to pain, and sleep was difficult due to a constant ache in her shoulder that was worse at night. Ex. 1 at ¶ 21. She could not hold her phone or a cup in her left hand with her arm bent for any length of time without changing hands. *Id*. She could not reach into the backseat of a car without pain, and carrying weighted objects with her arm at her side was painful. *Id*.

As of May 2024 (when Petitioner signed her third sworn statement), Petitioner stated that she continued to be limited in what she could do. Ex. 10 at ¶ 8. She and her husband are "do it yourselfers" who built a home. *Id*. She explains that the "finish work"

takes longer because her husband has to do most of the work. *Id.* Prior to her vaccine injury, she prepared and painted walls and did wood finishing, taping, drywall sanding, yard work, gardening, and gathered tools. *Id.* Now, she is limited to carrying one tool at a time, causing her to make more trips up and down stairs and ladders. *Id.* She can now do light housework, but her husband has to do more physically demanding tasks like washing walls, putting food in upper cupboards, and reaching for items on high shelves. *Id.* She is able to carry and put away laundry, but needs to take breaks. *Id.*

Prior to her injury, Petitioner's favorite hobby was making hand stitched quilts. Ex. 10 at ¶ 9. Doing so requires manipulating multiple yards of fabric, along with batting, making the quilts heavy and requiring the use of both hands. *Id.* Since her shoulder injury, she does not have the strength in her injured shoulder to manipulate the heavy fabric and tires easily, and thus no longer makes quilts. *Id.* She has four unfinished quilts, which she does not think she will ever be able to complete. *Id.* She adds that she is less active, and thus has gained weight and her health has worsened. *Id.* at ¶ 10.

Petitioner filed text messages from December 2021 and January 2022 as Exhibit 5, along with a sworn statement stating that those messages are between her and her daughter Tricia and that the messages re true, correct, complete, and unadulterated. Ex. 5; Ex. 10 at ¶ 2. In a December 18, 2021 message, Tricia asked Petitioner how she was doing and Petitioner responded that she had a "stiff neck, legs are tight with lots of knots and shoulder killing me," without further explanation, Ex. 5 at 1. In her third sworn statement, Petitioner elaborates that she was referring to her left, vaccine-injured shoulder in this text message. Ex. 10 at ¶ 3. She adds that she and her husband were doing roof repairs at this time, and using her left arm for this exacerbated her shoulder pain. *Id.* She adds that the neck pain referenced in the message was due to new pillows, and the leg knots were from going up and down stairs helping her husband with roof work. *Id.*

In a January 25, 2022 text message, Petitioner stated that she did not want to get a vaccine at a pharmacy because "[t]hey messed up my left arm don't want no pharmacy." Ex. 5 at 3-4. Tricia encouraged her mother to notify someone of her continued shoulder pain, and Petitioner responded that she planned to do so. *Id.* at 4. In her third sworn statement, Petitioner explains that she and her daughter were texting about getting COVID vaccine boosters, and that Petitioner did not want to get hers at a pharmacy due to her injury from the October vaccinations, which had been administered in a pharmacy. Ex. 10 at ¶ 4.

## II.     Factual Findings and Ruling on Entitlement

### A.  Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[3] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury,

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

6

or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five month mark.

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological

abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B. Parties' Arguments on Entitlement

Petitioner argues that when she sought treatment for her shoulder injury, she reported pain since the time of her October vaccination. Petitioner's Motion for Ruling on the Record, filed May 17, 2024, at *23-24 (ECF No. 34) ("Mot."). Although she did not seek care for her shoulder pain right away, she also did not attend medical visits for other matters during this time. *Id.* at *23. And she first contacted her PCP complaining of vaccination-related shoulder pain just over three months after vaccination. Petitioner's Reply, filed Aug. 12, 2024, at *1 n.1 (ECF No. 36) ("Reply").

Respondent argues that Petitioner's four month delay in seeking care, along with the record evidence, do not preponderantly demonstrate that she suffered left arm pain within 48 hours of vaccination. Respondent's Response, filed July 29, 2024, at *6 (ECF No. 35) ("Resp."). And Petitioner's first mention of shoulder pain in text messages does not specify which shoulder was painful, and does not relate the pain to vaccination. *Id.*

### C. Factual Findings on Onset

I find that the record supports a finding that Petitioner's shoulder pain likely began within 48 hours of vaccination. Although she did not contact a treater about her shoulder

8

pain until over three months after vaccination, and was not seen until a month after that, she consistently reported pain that she stated began just three hours after vaccination. Ex. 3 at 708, 773.

Respondent relies solely on Petitioner's treatment delay in opposing a ruling on entitlement. But as I have stated many times in other decisions, it is not uncommon for SIRVA claimants to delay seeking care in the hope that the pain will resolve on its own. *Tully v. Sec'y of Health & Human Servs.*, No. 21-1998V, 2024 WL 4533515 (Fed. Cl. Spec. Mstr. Sept. 20, 2024) (finding onset occurred within 48 hours although claimant did not seek care for two and a half months); *Diaz v. Sec'y of Health & Human Servs.*, 20-1003V, 2023 WL 8440873, at *6 (Fed. Cl. Spec. Mstr. Nov. 1, 2023) (finding onset was within 48 hours where the petitioner delayed seeking care for over three months after vaccination); *Buck v. Sec'y of Health & Human Servs.*, No. 19-1301V, 2023 WL 6213423, at *7 (Fed. Cl. Spec. Mstr. Aug. 23, 2023) (finding onset of pain occurred within 48 hours where the petitioner did not seek care for over three months and noting that a delay in seeking care is relevant to onset, but not dispositive).

Petitioner has credibly explained her delay in treatment. She initially thought the pain was normal vaccination-related pain, though worse than usual. She was grieving the loss of an adult child, and wanted to protect her husband and daughter, who were at high risk for COVID complications. And she did not seek care for other conditions during this time. When she did seek shoulder-specific care, she consistently related her pain to vaccination, explaining that it began three hours after she received the vaccine.

### D. Factual Findings on SIRVA QAI Criteria and Statutory Requirements

The remaining QAI and statutory requirements are not disputed, and I find that they are satisfied. The record does not contain preponderant evidence that Petitioner had a history of left shoulder pain or any other condition that would explain her post-vaccination symptoms. Ex. 3 at 615. She exhibited reduced ROM, and her pain and ROM limitations were limited to the vaccinated shoulder. Ex. 3 at 725, 774, 883. She received a covered vaccine in the United States. Ex. 2 at 2. She experienced residual effects of her injury for more than six months. Ex. 3 at 883. And she states that she never received compensation in the form of an award or settlement for her vaccine-related injury, nor has she filed a civil action prior to this case. Ex. 1 at ¶ 23.

Petitioner has established by preponderant evidence that all Table SIRVA and QAI requirements are established. Further, she has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

### III. Damages

#### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Matthews v. Sec'y of Health & Human Servs.*, No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[4]

#### B. Parties' Damages Arguments

Petitioner seeks a pain and suffering award of $60,000.00, relying on *Rayborn*, *Roth*, and *Knauss*, which involved awards of $55,000.00, $58,000.00, and $60,000.00, respectively.[5] Mot. at *25.

Ms. Collins asserts that her case is nearly identical to *Rayborn*, except that this matter involved longer and more intense treatment than experienced by the *Rayborn* petitioner, while in this case seeing less improvement in her condition from treatment. Mot. at *27. Petitioner acknowledges that the *Roth* petitioner initially sought treatment much sooner (less than a month after vaccination), and attended two more PT sessions, but asserts that this claimant did not receive any steroid injections and experienced greater improvement in her condition. *Id.* at *30-31. Similarly, Petitioner asserts that the *Knauss* petitioner experienced greater improvement in his condition and attended fewer PT sessions, although he sought care somewhat sooner than Ms. Collins. *Id.* at *32-34.

---

[4] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[5] *Rayborn v. Sec'y of Health & Human Servs.*, No. 18-0226V, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. Aug. 14, 2020); *Roth v. Sec'y of Health & Human Servs.*, No. 19-0944V, 2021 WL 4469920 (Fed. Cl. Spec. Mstr. Aug. 31, 2021); and *Knauss v. Sec'y of Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018).

Respondent does not propose an alternative award sum, asserting that damages briefing before entitlement is resolved is premature. Resp. at *6-13. If I find that Petitioner is entitled to compensation, however, Respondent asserts that Petitioner's overall injury was "very mild" and proposes an award consistent with other such cases. *Id.* at *8. Respondent argues that Petitioner's care spanned a five-month period, consisting of an ultrasound, prescription medication, one steroid injection, and 19 PT sessions. *Id.* at *11. Respondent asserts that the *Roth* and *Knauss* petitioners sought care sooner, and for a longer period of time, with more PT. *Id.* at *11-13. And the *Rayborn* petitioner rated her pain two to six out of ten. *Id.* at *12.

### C. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

Petitioner suffered a mild to moderate SIRVA that did not require surgery. Treatment lasted up to nine months after vaccination and featured receipt of a steroid injection, 19 PT sessions, an ultrasound, and prescription medication. At the conclusion of her care, she continued to experience moderate pain levels and her ROM remained restricted. She has lingering restrictions which have resulted in her not being able to engage in her former favorite hobby, quilting. And she is less active, which has negatively affected her health in other ways.

I find that Petitioner's injury is most similar to *Rayborn*. Both Ms. Collins and the *Rayborn* petitioner delayed seeking treatment for their shoulder pain for approximately four months, with the *Rayborn* petitioner seeking care only slightly sooner than Ms. Collins. Each treated with a steroid injection and PT, with Ms. Collins attending somewhat more PT. Both petitioners treated until approximately nine months after vaccination. Ms. Collins rated her pain level somewhat higher, and also had greater lingering deficits at the end of her care.

I find that *Roth* and *Knauss* are not as good comparable cases, by contrast. The *Roth* petitioner first sought treatment less than a month after vaccination and reported "sharp exquisite pain" that she rated up to ten out of ten and "really, really painful" PT that left her in tears – suggesting a more severe injury. And the *Knauss* petitioner also sought care sooner than Ms. Collins, less than three months after vaccination, had higher pain ratings, and treated for somewhat longer (although with a lengthy treatment gap).

In light of the record evidence, I find that an award of **$55,000.00** for pain and suffering is appropriate.

11

**Conclusion**

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $55,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[6] Additionally, I find that Petitioner is entitled to **$61.97 in out-of-pocket expenses**.[7]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $55,061.97, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[8]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[6] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[7] Respondent does not contest or otherwise address this expense in his response. Petitioner has filed Ex. 11 containing supporting documentation for this expense. Ex. 11 at 4 (listing appointments for office visits, PT, supplies, and a steroid injection). The sum awarded is consistent with the corroborative proof offered by Petitioner.

[8] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.